et al. Wait until your fellow counsel have been seated and now we'll hear from you. Thank you, Your Honor. May I reserve a minute for rebuttal? You may. This is an important case. We'll relax the ten-minute time period. Thank you, Your Honor. I appreciate it and may it please the Court. Almost 35 years ago, the United States Supreme Court issued a ruling that is the controlling precedent in cases where an out-of-state plaintiff sues an out-of-state defendant for defamation. The Keaton case has never been overturned and never been limited. It sets forth the legal rules that control this case. In Keaton, there was no even discussion as to whether someone in the state of New Hampshire actually read the defamatory article, and for good reason. We were dealing with, what, 10,000 to 15,000 magazines, so obviously someone read it. Here, as I understand it, you have no evidence that there was any effect within the state of New Hampshire in terms of there's no evidence that any human being in New Hampshire ever read this. Am I correct? That's correct, Your Honor, but if I may, let me unpack that question a little bit. Just stay with Keaton for a second. For whatever it's worth, isn't that a pretty significant distinction from Keaton? I think it appears more significant on first glance than it will after some analysis. As I just conceded, there is certainly, in the evidentiary record, we've been unable to locate any person who actually, in New Hampshire, could be proven to have read these articles. Nonetheless, first of all, it's worth remembering the type of publication that was at issue in Keaton. In Keaton, you had Hustler Magazine, and I am old enough to remember that in the 1980s, when Keaton was decided, it was something of a joke that people didn't read the articles in that sort of magazine. We have no idea, really, if anybody actually read the article that defamed Kathy Keaton. We presume it, and what do we presume it from? We presume it from paid circulation, from 10,000 to 15,000 paid circulation in New Hampshire. Well, in this case, you have the equivalent. You have paid circulation. Yes, it is nominally one subscriber, Dartmouth College. But when you compare it, I don't think Keaton was talking about... In Keaton, there was no dispute that the magazines got sent to the subscribers in the state. So, you not only had paid subscriptions, you actually had, in fact, distribution, and the only question was whether, out of 15,000 people, no one happened to read that article. Here, isn't there affirmative proof that the truck that was carrying the 15,000 magazines to New Hampshire never got over the border? So, there may have been 15,000 prescribers, but there were 15,000 magazines sitting in a warehouse that no one had seen. In other words, there's affirmative proof here that no one accessed the portal. Your Honor, I think that's a bit of a strained analogy. Okay, tell me why. First of all, with respect to Keaton, we actually only know that there was 10,000 to 15,000 paid circulation. Paid circulation does not necessarily mean subscribers. It refers to subscribers. It refers to people who may have bought Hustler Magazine at a newsstand or at a liquor store. In New Hampshire. In New Hampshire. But the one thing that you are sure of is that the physical objects representing the paid circulations were physically in the state of New Hampshire. Isn't that correct? Yes, Your Honor. Right, and here you are met with, as Judge Kayada said, you are met with affirmative evidence that those with possible access digitally never exercised their right of access. So that, in fact, it never got beyond the point that would be true in Keaton if the 15,000 magazines had been sitting in Massachusetts and any of the 15,000 paid subscribers had a right to go to Massachusetts and get it. Here, no one exercised the opportunity to get it. And isn't that, number one, a distinction from Keaton and an affirmative proof that there was no exposure of the content of that magazine to anyone while in the state of New Hampshire? Not quite, Your Honor. First of all, it's worth remembering that although there isn't evidence that any paid subscribers accessed the defamatory articles, that's not the same thing as saying there's no evidence that anybody in New Hampshire accessed the defamatory articles. It's as close as we're going to get. You don't have any evidence to that effect? What I'm referring to, Your Honor, is the fact that the defamatory articles, the way the Appellee's publication works, is that they also publish on a website called thestreet.com. That caught my attention for precisely the reason you said, but I was mystified. It's the parent, it's not the defendant here, right? Yes, Your Honor. And the parent has a website that can be accessed remotely. You mentioned that in, I believe, one sentence in your statement of facts, and then I found not a single reference to it in your entire argument. You made nothing of it at all. And then I looked at your prior brief, and you don't seem to make anything of it at all. And now you're about to make something of it. What is it we should find, and why isn't it waived with respect to what the parent did on its website that can be accessed from anywhere in the world? Well, again, let me unpack that. First of all, the reason why I'm mentioning it here, actually, was to correct a suggestion that was being made by the court that, because no paid subscribers have been proven to have read this in New Hampshire, that that's the same thing as saying nobody in New Hampshire read it, so I thought it was important to correct the record. Getting back to why more of this wasn't made in the brief, the actual point there is something I actually agree with appellees on, which is that merely putting something up on a website that people in New Hampshire can access, there's like 100 personal jurisdiction cases that say that, the extra element of some sort of purposeful availment of the privilege of doing business in the forum state, that that's not sufficient, that simply publishing something on your website that anyone on the internet can read does not subject you to 50 states of jurisdiction. So then you're back to why, particularly under the relatedness prong, if this action isn't arising out of what was on the parent's website, so it's those 21 people who access the website, this action isn't arising out of that because of the cases you just mentioned, then what is its relevance, or is that the reason why nothing was said about it in the briefs? Well, I want to make a, almost nothing was said about it in the briefs. It's not, the problem with that fact is that in the end, I don't, I can't honestly come to this court and say that this court should make a decision that just because somebody puts something up on their website that can be accessed for free. Yes, thank you. If I can cut to the chase, you seem to be arguing that there was a sufficient prima facie case made of purposeful availment that we should reverse the district court. Is that the essence of your argument? That is the essence of my argument. All right, so briefly, what about the other two prongs, and why do you think the district court got it wrong on those two prongs? Well, first of all, with respect to relatedness, I think the important thing to remember on relatedness is under the case law, it's a minimal requirement. It's a very minimal requirement. But it's still a requirement, and you have the burden on it, and as I understand it, you have no evidence whatsoever of consumption of the defamatory material in New Hampshire that would satisfy the relatedness prong. My answer is that, Your Honor, I do not believe that the relatedness prong requires proof of consumption. In fact, it can't require proof of consumption, because there was no proof of consumption in Keaton. But there was a higher probability in Keaton because of the physical material in the state of New Hampshire, and you have no analog to that in this case. Well, Your Honor, I don't think there's anything in Keaton that discusses the issue of probability. I don't think that's what the relatedness prong... Relatedness is relying, I guess, on common sense. Well, Your Honor, I don't think that the relatedness prong... Here's the point. I do not believe that the relatedness prong requires a showing that the cause of action arose out of a specific identifiable individual in New Hampshire who read the material. Let me test why that might be a problem and see what you say. Imagine, put to one side the single publication rule for a second, and you've sued in New Hampshire, and that's the issue. It seems to me, based on everything we know, you would lose because defamation requires not only the uttering of the statement but the hearing and understanding of the statement by a listener, and you're going to end up with zip on that. So you lose the case. So it seems to me to... The court talks about relatedness in terms of arising under. This cause of action seems to arise under the damage done to your client in other jurisdictions. You want to use the fact that there was an effort to publish and an effort to communicate in New Hampshire that was unconsummated as your toehold to then litigate what actually arose under 100% of the damage would be in other jurisdictions. That's how I'm interpreting the argument. Your Honor, I understand that, and it's an interesting point. However, the problem is that in the end, it seems to me to impose a proof requirement at the personal jurisdiction case that wasn't imposed by Keegan. Here's how I view the relatedness requirement, and this might flush this out. The relatedness requirement requires that the cause of action for defamation arise out of a publication that occurred, in some sense, in the state of New Hampshire. If the defendants proved that this material was never even published in New Hampshire, that, for instance, they had installed software that prevented its distribution into the state of New Hampshire, then they would win on the relatedness claim. So what evidence do you have that this ever got to New Hampshire, other than the website by the parent? There's no doubt that it got to New Hampshire in the sense that it was included in the e-mail attachments of at least a couple of individuals in the Dartmouth County Court. There were two individuals who got three e-mails, right? Yes, Your Honor, and they did not open them. And that is the claim that the appellees make. Isn't there evidence supporting that? Your Honor, if they didn't open the e-mail, they didn't see what was in it. Your Honor, I am not entirely sure of how the process of determining whether someone opened an e-mail attachment works. However, what we can say with some certitude is that the appellees intentionally e-mailed into the state of New Hampshire to pay New Hampshire residents under a paid subscription materials that the plaintiffs that my clients contended were defamatory. Well, I thought they sent an e-mail with a PDF as a link to a server someplace, right? That's correct, Your Honor. So is there any evidence that the server, that they ever hit the link? There's no evidence that they hit the link. And is there any evidence as to where the server was? There's no evidence as to where the server was. We presume it was out of state. So on the third factor, the gestalt factors, what is your argument there that the district court erred? Your Honor, I think on the gestalt factors, the major point here is that the district court was inordinately concerned with an issue of forum shopping. And it was repeated over and over again in the district court's discussions of the gestalt factors. And in fact, it appears over and over again in the appellee's brief. And various terms like gamesmanship are used to describe it. And in this instance, my clients are exactly on all fours with Kathy Keaton. Kathy Keaton filed her claim in Ohio. Kathy Keaton was lost in Ohio on the grounds that the statute of limitations barred her claim in Ohio. She then clearly, and nobody denied this at the Supreme Court or anywhere else, she clearly shopped around for a more attractive forum, found New Hampshire with its longer statute of limitations, and filed there. So they make something out of the fact that your client never denied their the leaker from the federal agency who had provided them with this information. And they say that makes this case different. Your Honor, there is, I can represent to the court there is no, that was not the intention of this case. This case is filed. And you didn't deny it in your papers. It's not a matter of you representing things to us. But do you have a good explanation for the withdrawal of the New York action other than New Hampshire had a longer statute of limitations? That is the explanation, Your Honor. The explanation is that obviously our clients filed, we filed in New Hampshire because New Hampshire offered the longest available statute of limitations. And my clients want to prevail on the lawsuit. That has nothing to do with trying to out the name of a reporter. I cannot say to you, having not looked at the shield laws that might be applicable, whether we would even have any chance of obtaining the name of a source. Did you make any request for any jurisdictional discovery that the district court rejected and refused to give to you? The answer to that question is we requested jurisdictional discovery and received jurisdictional discovery. And the results of that are most of which you can see in the sealed appendix. So in other words, the answer is no. Yeah, the answer to the compound question, I was trying to make sure that the record reflects we did ask for discovery, but we got it. That's the answer. Thank you. Thank you. Thank you, Your Honor. May it please the court, Elizabeth McNamara of Davis Wright Tremaine for the appellees of Scottsdale and Mr. the reporter, Bill Maher. The court is correct to focus on the relatedness prong of the three-part test because once you decide, as the court below decided and as we submit this court should affirm, there is not sufficient relatedness to the cause of action at issue here. The court need not even go further, although we believe we prevail on each prong. So what do you mean we need not go further? We have three prongs. We're supposed to look at all three of them. Yes, Your Honor, you are. But it is a test that requires meeting each and every prong. So if there's cleansing relatedness, then jurisdiction. If the court confirms that jurisdiction, that doesn't change the outcome of the question. Don't you plainly lose on purposeful? There's clearly purposeful availment here. Well, Your Honor, I don't agree. Put this terminology to one side. Your client went to efforts to try to find someone in New Hampshire who would pay to receive your client's publications. Yes. And the client knew that entity was in New Hampshire. Absolutely, Your Honor. There's no question that the defendants intentionally sought a contract and obtained a contract in New Hampshire with Dartmouth. For the purpose of sending publications to New Hampshire. Correct. However, that resulted in what we would submit a thin distribution that, when you look at the whole of the gestalt of everything, then we would argue would not meet purposeful availment. But even if you assume it meets purposeful availment, as the court indicated in its questions, it does not meet the relatedness, nor do we submit it meets the reasonableness of the three-pronged test. So focusing again on the relatedness, what the court, I think, is correct, and the appellant is correct, that in Keaton there was a presumption that there were readers. However, here that presumption has been rebutted with the actual evidence in the record. What about the first, the earliest email to the two subscribers of the newsletter? As I understand it, your client was unable to say that they did not open their emails. Correct, Your Honor, because the data tracking that was implemented by the deal only started after the receipt of that. So if we put to one side the parent's website issue, as we discussed with counsel, and we're down to the Dartmouth subscription and then the newsletter, we've got it down to there was one newsletter sent to two recipients that contained the defamatory article as an attachment, and we don't know whether they opened it or not. Correct, Your Honor. What's a court to do at that point when there's been an attempt to publish in New Hampshire, everything was done that would be necessary to have the reader do it? Do we have something like a postbox, mailbox rule that we presume that they opened it? Or do we say, no, the burden is on the party seeking to establish jurisdiction to show that they opened it? Or do we say this is prima facie stage? I'm trying to get a handle on what presumption would be brought to bear or what burden would be brought to bear to fill in the one evidentiary gap that there seems to be here. And I think, Your Honor, it touches on precisely what we would argue. The burden is on the plaintiff. The plaintiff has a prima facie duty to provide evidence to support that there was an actual injury in the state. If you're right that there was a prima facie, in other words, they had the burden, but it was only to make a prima facie showing, then why isn't it enough of a showing to say that you put it in an envelope, put a stamp on it, put their address on it, and gave it to the post office? Or you hit a button and sent an email, and the email address is, in fact, theirs. Why isn't that enough for a prima facie showing? Because, Your Honor, I think that they, first of all, in the record, they haven't rebutted the fact that no one read it. They haven't argued in this appeal, nor did they argue below, that those two readers, those two recipients of the newsletter may have actually read it. That simply isn't here. And so I would argue that they've waived that argument, but I don't think also it meets a prima facie showing of actual readership. What Keaton instructs and what Walden in the Supreme Court reaffirms unequivocally is that you have to have actual readers. There has to be an actual injury in the state. That's what Keaton was trying to address in New Hampshire, that they were protecting their residents. And I think the mere fact that someone may have opened an email recipient and there's no evidence that they did, I would submit, doesn't rise to the level of material relatedness to the cause of action that this court has instructed. Does the plaintiff know who the two individuals were? Yes, I believe they do. It was in the documentation that we provided there were identifications. One of the issues is that it's the publisher who gets the data on who has opened the emails, right? Correct. And the plaintiff wouldn't ordinarily know that without going through jurisdictional discovery, and maybe the publisher hasn't yet subscribed to the service that tells them how many people actually read the subscription. So both for efficiency reasons and because courts will sometimes not ever have an answer to this question, it almost seems as though we should be reluctant to make this turn on absence of readership. The other thing I worry about is a separate role for online publications and hard copy publications. So in light of my concerns, I want to ask you this question, which is suppose there was evidence that these two emails, which we know arrived in New Hampshire and others have told me that means that they are in New Hampshire in computer terminology. Suppose they had opened that first article, that's two. Is that enough to establish relatedness? I would argue not, Your Honor. I feel like there has to be some threshold. As Your Honor wrote in Harlow, there needs to be a material connection. It's not simply an open door. There needs to be a material connection between the cause of action and the facts, the jurisdictional facts in New Hampshire. Sure. Two people in New Hampshire now think I'm a crook because you sent them a letter saying I'm a crook. Why don't I have a defamation claim against you in New Hampshire? Because, Your Honor, we don't have affirmative evidence that even begins to support that two people have that. Judge Lynch's question, if I understood it correctly, was presuming what would we do if we know those two did look at it. In other words, if the burden issue shifts to you, do you still have a winning argument because there were only two? I think that was the question. Yes. Thank you, and thank you for the clarification. I believe then we turn to if the court were to find, I would say that doesn't rise to the level of materialness under the relatedness prong in order to satisfy it. But let's assume it did. Then you move to the purposeful availment and the reasonableness prongs, and we submit for the reasons we've indicated that those prongs are not met either. Okay, there was the intentionality for purposeful availment, but it resulted in two people receiving a letter. Go back to my hypothetical. You write a letter to two people in New Hampshire, maybe Justice Souter is one of them over there. We know he wouldn't have opened his case. And you make an accusation regarding me that I consider most defamatory. I could sue you in New Hampshire over that defamation. If the other prongs were met, Your Honor, but I think that that's a very clear distribution. Why wouldn't it be? If right now you walked out of here and say, what a stupid judge, well, maybe that wouldn't be defamatory. So you say something else and you send it to New Hampshire. You've clearly purposefully availed yourself of New Hampshire. You've caused an effect to me. You've got two people in New Hampshire now who think poorly of me for a falsehood you've said. I don't think there's any doubt that I could sue you in New Hampshire. Well, I think that there you have the intentionality and the claim you are residing in New Hampshire. Again, this is always looked at as a holistic. No, no, I don't reside. That's Justice Souter. I remain. Not you personally, but in the hypothetical, the justice is residing in New Hampshire. Again, the personal jurisdiction is looked at holistically. You look at all the elements. What makes this case, and so in that hypothetical, the plaintiff resides in New Hampshire and clearly his... No, no, no. Okay. Unless you're saying you reside in New Hampshire. No. Okay. I don't reside in New Hampshire. You send a letter to two people in New Hampshire defaming me. I see. Are you saying I couldn't sue you in New Hampshire? I think that, Your Honor, if we know that that letter was received and we know that it was read... Which is what Judge Lynch asked you to presume. Then I guess we would go to the reasonableness prong that that's at issue here. And why wouldn't that be reasonable for me to be able to sue you in New Hampshire? Well, we'd have to know more facts about the relationship with the parties and the interests of the court and the like. But here we do have the facts as to the reasonableness. If Your Honors want, I'm happy to address that. And here, and I think that it was touched upon by my adversary in his argument, that the evidence in this record, it's not just speculation, that the primary purpose of this litigation has been to ferret out the name of the confidential source. That was, in fact, in the complaint that was filed in New York. That was spelled out in the complaint as the primary purpose that they were seeking, that they were saying that the SHIELD law would not protect. And what's wrong if the law entitles them to know that in defamation discovery? What's wrong with them being motivated by exercising their right of discovery in a suit to find that out? Well, because what they're doing here is that it was a three-part process on their part. They filed in New York, then they filed a subpoena in the Northern District of California, affirmatively seeking the identity of the source. That was quashed. They withdrew the New York action on the eve of filing our motion to dismiss when they well knew that we were filing it the next day. As the court below found, that was patent gamemanship and it shouldn't be tolerated and it counsels against reasonableness. And then they finally came to New Hampshire. And the other factor that tempers the notion that under Keaton and elsewhere, that a plaintiff should be able to form shops, should be able to go where they have an ability to state a claim, the record here also makes it clear that they knew from the outset when these articles were published in December of 2013 and early 2014 that they were published. They were the focus of their FINRA action in Arizona. Yet they chose to take no action against the defendants for the intervening almost three years, which I think supports as circumstantial evidence for the fact that the real purpose here isn't to redress injuries from those articles, but rather to use it as an ability to ferret out who the source was in order to buttress their pending claim in Arizona. Then if you add that into the gestalt factors as to what is the interest of New Hampshire, and the interest of New Hampshire is zilch. Based on the evidence that we have, we have no reason to believe that anybody in New Hampshire was actually injured. Does New Hampshire have a shield law? I believe it does, Your Honor, and I believe it would protect. But I honestly don't want to be wrong. I believe that's the case. So, Your Honors, for all the reasons we've indicated, we believe on this record there is simply not a prima facie evidence of jurisdiction that would support a finding of personal jurisdiction on our defendants. We believe that the decision below was correct and should be affirmed. I'm happy to address any other questions from the bench. You've exhausted our questions. Thank you very much. I appreciate your time and attention. Counsel, I believe you reserved one minute. I did, Your Honor. First of all, just to buttress the point that all it takes is one person to receive a defamatory communication in the state. We cited a case called Falling v. Hickey, which was from Ohio. The issue is, do you have the one? Well, Your Honor, what we have, as Your Honor noted, was, first of all, the people for whom we do not know if they opened the attachment. And then we have all this other evidence of distribution within the state. And we have, and while I don't think, as I said, that you can honestly get up and say that simply distributing from the free website alone is enough for jurisdiction, I do think it can be taken into account when deciding whether to deprive somebody of personal jurisdiction when there's been all this evidence of personal availment, and we have the people who access the article on the website. I just wanted to make one other quick point, if I could, with the court's indulgence. And that is that, with respect to the gestalt factors, the fact of the matter is that New Hampshire has the power to have a longer statute of limitations. That's part of our federal system. And what I hear from opposing counsel is, we don't have the right to file later in New Hampshire, or that should be counted against us as unreasonable. I don't think that can be done under a federal system where New Hampshire's made the choice. Interesting, New Hampshire has an interest in a cottage industry of defamation claims that have been barred by statute of limitations in other jurisdictions, because it sure sounds like that's what you're saying. Well, it's very possible. I mean, that's obviously the most negative way of characterizing it, but it's very possible that the U.S. Supreme Court is aware of that issue in Keeton, and yet they de facto approved it. Okay, thank you.